Argued September 9; reversed September 29, 1937

# KOSKI *v.* ANDERSON

(71 P. (2d) 1009)

350

Arthur I. Moulton, of Portland, for appellant.

A. C. Fulton, of Astoria (G. C. & A. C. Fulton, of Astoria, on the brief), for respondent.

RAND, J. This is an action by Abram J. Koski, as administrator of the estate of Julia Koski, his deceased daughter, to recover damages for the death of the decedent, which, the complaint alleges, resulted from the gross negligence and intoxication of the defendant, Ernest Anderson, in the operation of an automobile in which the decedent was riding as a guest of the defendant.

The jury returned a verdict for the defendant and, from a judgment entered thereon, the plaintiff has appealed.

The evidence shows that shortly after 7 o'clock on the evening of January 31, 1936, Ernest Anderson, the defendant, a boy 18 years of age, left Astoria for Portland in an automobile driven by himself accompanied by decedent, who was about 17 years of age, her sister, Helen Koski, Sylvia Siren and George Takanen, the last three being slightly older than the defendant, all of whom were guests of the defendant; that they traveled over what is known as the Lower Columbia River highway and, upon reaching a point

on said highway about one mile east of Scappoose, the automobile, while being driven by the defendant, left the highway, struck an obstruction and overturned, killing the decedent and more or less severely injuring all the other occupants of the automobile.

It is undisputed that, before leaving Astoria, the two boys purchased two bottles of wine and some beer, all of which they placed in the back of the car. Helen Koski and George Takanen rode with the defendant in the front seat and the decedent and Sylvia Siren rode in the back seat and were so riding at the time of the accident. After they had started, the beer was found to be unfit to drink and was thrown away. Upon reaching Taylorville, they stopped and each of the boys, but not the girls, purchased and drank a glass of beer. Upon reaching St. Helens, they again stopped, got out of the car, purchased some potato chips and all the parties each drank one glass of beer.

St. Helens is about 76 miles from Astoria and the highway between said points was dangerous because of its icy condition. For that reason, the defendant had driven the automobile very carefully and at a slow rate of speed.

In the meantime one of the bottles of wine had been drunk. According to the testimony, Julia Koski, the decedent, had merely tasted it, all the others drank some of the wine, the two boys having drunk most of it.

While stopping in St. Helens and after drinking the beer, they got into the car, ate the potato chips, drank some more wine and then started for Portland. After traveling a short distance and before reaching Scappoose, the defendant commenced to speed up the car. This was the first time, so far as the evidence shows, that the defendant had shown any signs of intoxication. All the parties remonstrated with him and told him he

was driving too fast. Upon reaching Scappoose, which is about eight miles from St. Helens, the defendant called for more wine and, while it was not true, he was told that there was none of it left. He then threatened that, unless the wine was produced, he would drive 70 miles per hour. There is no dispute as to any of the above testimony except the defendant admits that he asked for the wine but says he does not remember threatening to drive at the rate of 70 miles per hour if the wine was not produced, nor does he deny that he did speed up the car. After leaving St. Helens, the car was not stopped until the accident occurred. In describing what was done in St. Helens and what occurred prior to the happening of the accident, Helen Koski testified as follows:

"Q. Except the beer, the boys got at Taylorville and before you got to St. Helens, do you know of any other beer drinking than you have already told us about? A. No. Q. Then you came to St. Helens; do you know about what time of night it was? A. No, I don't; I remember I looked at the clock but I don't remember what time it was. Q. You don't remember the time? A. No. Q. Up to that time, how fast had the car been travelling? A. He had been driving carefully; I couldn't say how fast. He drove carefully up until that time. Q. Had there been any talk about the condition of the road? A. That is what we had talked about all the way up that it was slippery. Q. What had been said in the car as you went along as to its being slippery? (Objection) I will change it then; Had Julia said anything in regard to the road being slick? A. Yes, she had. Q. What had she said? A. She said, remember it is slippery and we should drive carefully and he said he would. Q. He said what? A. He said he would drive carefully. Q. Up until the time you got to St. Helens, had he been driving carefully? A. Yes. Q. What happened at St. Helens? A. We all got out and went, there is a place there where they had beer; the

boys wanted beer so that we all went in and had some beer and we went in a little grocery store and got potato chips. Q. Up until that time had you noticed any indication whether Ernie was drunk or not? A. No, not— Q. After you left St. Helens, as I recall the distance it is nine miles from Scappoose to St. Helens, what happened on that trip to Scappoose? A. He had drove faster; we had remarked all the time that he should have to drive carefully, the pavement was slippery and then we got to Scappoose. Q. Then before you got to Scappoose how had he been driving? A. He had been driving fast then. Q. Was there any conversation about his driving? A. Yes. Q. And what was said by anyone in the car and by whom? (Objection) What was said by anybody in the car when going toward Scappoose? A. All of us girls had said about he shouldn't drive so fast; he mentioned that he knew the road, he knew it. * * * Q. Then did you stop at Scappoose? A. No. Q. What happened after you left Scappoose and up until the time of the accident? A. We had gone a little ways and Ernie asked for a drink of wine; I told him that it was all gone, then we began changing the subject and were talking about something else and all of a sudden Ernie said, if you don't produce that bottle of wine I will drive 70 miles until you do. Q. When he asked for the bottle of wine, what did you say in answer to his request for the bottle of wine? A. I said the wine was all gone. Q. Did he immediately answer back? A. No, he didn't—No, I don't believe he said anything to that; anyway we started talking about something else. Q. How far did he drive before you said the next thing? A. Not very far. Q. Can you remember how he said that; how he was going to drive? A. I think he used the word 'produce'; if you don't produce that bottle of wine I will drive 70 miles an hour until you do. Q. Did you say anything in answer to that? A. He was going fast and I wanted he should stop driving so fast, I would give it to him. The girls were screaming in back and— Q. How fast did he get going until you got to where you could see the curve sign ahead? A. I couldn't say but it was very fast. Q. You have ridden a great deal in cars have you? A. Yes. Q. How

354

fast would you estimate it was going when you came in sight of this curve sign? A. At least sixty. Q. Did you see curve signs on the— A. Yes. Q. What if anything was said when you saw the curve signs ahead. A. I told him there was a curve, he couldn't make it and he didn't slow down. Q. Did he slow down? A. He didn't. Q. What did he do as to speed? A. The accident happened just about right then and he didn't slow down, he just kept on going at the rate, faster. Q. Just kept on going? A. Yes. Q. Did he slow down when you called attention to this curve sign? A. No. Q. Could you tell us how fast in your opinion the car was going at the time he left the road? A. Certainly must have been close to 70 if it wasn't that fast. Q. It was close to 70 miles an hour. A. Yes. Q. How far back had the, the girls been screaming before you got there— (objection) What happened after he said he was going to drive 70 miles an hour until you gave him the wine; what did the other members of the party say or do then? A. All the rest of us were screaming and said for him to drive slower. Q. What was Julia doing? A. She was telling him to slow down too. Q. What did you say to Ernie? A. I told him if he would slow down I would give him the wine. Q. You told him if he would slow down you would give him the wine? A. Yes. Q. Did he slow down? A. No. Q. Now then, how did the accident happen as well as you can tell us. A. Happened right after that when we saw that curve coming all I remember is a crash, lots of noise. * * *''

George Takanen, who was called as a witness for the defendant, testified substantially to the same state of facts and this testimony is wholly undisputed in the record. At the close of the testimony, the court, over the objection and exception of the plaintiff, charged the jury as follows:

''It is the duty of an invited guest riding in an automobile, who knows, or by the exercise of ordinary care should know, that the driver thereof was intoxicated, to immediately demand that the vehicle be immediately stopped, so that he or she shall be able to get out, and

upon it being stopped, to forthwith get out, and if such guest shall fail so to do and shall receive any injury, as a result of the intoxication of the driver, she can recover nothing in damages therefor. So even though you shall find that at and prior to the accident, the defendant Ernest Anderson was intoxicated while driving the automobile in question, if you further find that the decedent Julia Koski knew it, or by the exercise of due care should have known it long enough before the accident to have had time to have asked him to stop and let her out, under all the circumstances then prevailing, and yet, if you further find that she made no demand that the vehicle be stopped so she could get out, your verdict must be for the defendant.

"In this regards, the burden of proof is upon the plaintiff to satisfy your minds by a preponderance of the evidence both that the defendant was intoxicated— I should say it is the burden of proof resting upon the plaintiff to satisfy your minds by a preponderance of the evidence, that the defendant was intoxicated at such time and she must have established this fact without disclosing that Julia knew of that condition or in the exercise of reasonable prudence, should have known of it in time to have been able to ask him to stop the automobile and let her out before the happening of the accident, considering all of the circumstances under which she was riding with the defendant. Those circumstances of course, include the darkness and the time of night and the other surrounding circumstances.''

 It is the duty of a passenger in an automobile operated by another not for hire to use ordinary care for his own safety. The test by which the care or want of care of a passenger so riding is to be determined is what a reasonably prudent man, under the circumstances disclosed by the evidence in the individual case, would have done to insure his own safety after he had become or, by the exercise of reasonable diligence upon his part, would have become aware of the peril. Whether he has done so or not is ordinarily a question for the jury and,

therefore, unless the evidence clearly shows that the injured party had failed to perform that duty and that, by reason thereof, he had sustained the injury complained of, the court would not be authorized to direct a nonsuit: *Strang v. Oregon-Washington R. & N. Co.,* 83 Or. 644 (163 P. 1181); *White v. Portland Gas & Coke Co.,* 84 Or. 643 (165 P. 1005); *Saylor v. Enterprise Electric Co.,* 110 Or. 231 (222 P. 304, 223 P. 725); and *Mitchell v. Bruening,* 139 Or. 244 (9 P. (2d) 811).

The vice of the instruction complained of was two-fold in character. One, its effect was to withdraw from the determination of the jury the question whether the deceased was wanting in ordinary care in failing to remonstrate and withdraw from the automobile under the circumstances disclosed by the evidence and, if so, whether such want of ordinary care proximately contributed to the injury, and two, it assumed that it was the absolute duty of the decedent, first, to remonstrate against the excessive speed and then to immediately withdraw from the automobile regardless of whether she had a reasonable opportunity to do so or not, and regardless of all the other facts and circumstances in the case. Upon this question, the court in *Curran v. Earle C. Anthony, Inc.,* 77 Cal. App. 462 (247 P. 236), said:

"The duty of a passenger to remonstrate against excessive speed or to withdraw from the vehicle, a reasonable opportunity therefor being afforded, is not absolute, the question whether by failing to do either he is wanting in ordinary care being dependent upon the circumstances of the particular case. Dowd v. Atlas T. & A. Service Co., 187 Cal. 523, 202 P. 870.''

■■ In civil actions the instructions should be based on and confined to the issues raised by the pleadings and the evidence. A violation of this rule, however, will not

be grounds for reversal where it is clear that the complaining party has not been prejudiced. Under the evidence in the instant case the giving of this instruction was prejudicial and required the reversal of the judgment, since its effect was to withdraw from the jury the right to determine the question of whether Julia Koski, who was shown to have protested against the speed with which the automobile was being driven, had acted as a reasonably prudent person would have acted under the same circumstances in not demanding that the automobile be immediately stopped and that she be permitted to withdraw from the car at that time and place, and also for the reason that it assumed as a matter of law that her protesting was not sufficient and that it was her absolute duty to demand that the car be stopped and that she be permitted to withdraw, and that, because she had not done so, no recovery could be had for her death.

■ The other assignment of error is based upon the court's refusal to permit the plaintiff to offer evidence tending to show that while passing through St. Helens and Scappoose all places were closed for the night except one all-night beer parlor in St. Helens. This evidence was offered for the purpose of showing that if decedent had refused to continue on from St. Helens there was no place open in which she could have passed the remainder of the night. This evidence we think was material upon defendant's theory that, if the driver showed signs of intoxication while in St. Helens, it was decedent's duty to refuse to proceed further with him and that her failure to do so was contributory negligence upon her part.

For these errors, the judgment is reversed and the cause is remanded for a new trial.